Brad WILLIAMS, Plaintiff,

v.

**FIRST GOVERNMENT MORTGAGE AND INVESTORS CORP., et al.,** Defendants.

**Civil Action No. 96–1993(JR).**

United States District Court, District of Columbia.

July 17, 1997.

Andrew L. Sandler, Rachel A. Mariner, Skadden, Arps, Slate, Meagher & Flom, L.L.P., Washington, DC, Jean Constatine Davis, for Elderly American Assoc. of Retired Persons, Washington, DC, for Plaintiff.

Nathan I. Finkelstein, Bethesda, MD, for Defendants Industry Mortgage Co., L.P., First Gov. Mortg. and Investors Corp.

Robert E. Sharkey, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, Baltimore, MD, for Defendants Central Money Mortgage Co., Charles Hardesty.

### MEMORANDUM

ROBERTSON, District Judge.

On May 15, 1997, a jury returned a verdict of $8,400 in favor of plaintiff Brad Williams against defendant First Government Mortgage and Investors Corporation ("First Government"). The award was trebled to $25,200 in accordance with the District of Columbia's Consumer Protection Procedures Act, D.C.Code § 28–3905(k)(1). The jury had been instructed, in accordance with the Act, that it could award economic damages to Williams if it found either that First Government knowingly took advantage of Williams' inability to protect his interests in connection with a real estate loan made to him, or that First Government made the loan knowing that there was no reasonable probability that Williams could keep up with his payments.

Now before the Court is Williams' motion for judgment on his equitable claim that the entire loan transaction was unconscionable. The relief prayed for is rescission of the mortgage loan. Williams also renews, post-trial, his motion for judgment as a matter of law on his claim that First Government violated the Truth in Lending Act, and First Government moves for judgment notwithstanding the verdict. For the reasons set forth below, all three motions will be denied.

### I. UNCONSCIONABILITY

This case went to the jury on a statutory claim. The statute makes it a violation of District of Columbia law to "make or enforce unconscionable terms or provisions of sales or leases...." D.C.Code § 28–3904(r). Because the term "unconscionable" is probably not in the lexicon of the ordinary lay juror, the elements of an unconscionable contract found in *Williams v. Walker–Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C.Cir.1965)— absence of meaningful choice and terms unreasonably favorable to one party—were set forth in the jury instruction by way of a definition. The jury, however, carefully was not asked to decide if the contract was unconscionable. See *Dawson v. Contractors Transport Corp.*, 467 F.2d 727, 730 (D.C.Cir. 1972). Instead, the jury was asked to decide whether terms or provisions of the mortgage loan were unconscionable, and they were instructed to make their decision on the basis of the two factors set forth in D.C.Code §§ 28–3904(r)(1) and (5). Those factors—

knowledge by the lender that there was no reasonable probability of payment in full, and knowingly taking advantage of a borrower's inability to protect his interest—were the only two enumerated in the Act that fit the facts proven at trial.

Williams now argues that the verdict on his statutory claim requires me to find, under the common law doctrine established in the *Walker–Thomas Furniture* case, that the entire loan agreement was unconscionable. The argument is rejected for two reasons. First, the questions put to the jury were not the same questions upon which the common law unconscionability issue turns. Second, because the jury was permitted to return a verdict for plaintiff if they found *either* of the two enumerated factors proven by a preponderance of the evidence, nobody can say what the jury found the facts to be. The jury's verdict thus does not "govern[ ] the entire case" as a matter of Seventh Amendment law. See *Kolstad v. American Dental Ass'n,* 108 F.3d 1431, 1440 (D.C.Cir.1997) (internal citations omitted).

▊ Williams can prevail on his common law unconscionability claim if 1) he did not have a meaningful choice about whether or not to enter into the loan agreement and 2) the terms of the agreement unreasonably favored First Government. *Riggs Nat'l Bank of Washington, D.C. v. District of Columbia,* 581 A.2d 1229, 1251 (D.C.1990). I find that the terms of the mortgage loan to Williams were indeed unreasonably favorable to First Government, but I cannot find that Williams lacked a meaningful choice.

▊ Williams' argument on the lack of meaningful choice proceeds from his assertion that he was under time pressure either to pay his D.C. property taxes or suffer the tax sale of his home. The notice of an impending tax sale undoubtedly motivated Williams' decision, but it did not deprive him of meaningful choice. Williams had known for weeks that a tax sale on his home was scheduled. The sale was not proven to be imminent.[1] Moreover, Williams had substantial experience in finding mortgage loans and had been actively shopping for a loan in the weeks before his entry into the agreement with First Government. Williams' testimony that he was upset by the terms of the loan, which plaintiff now argues demonstrates his lack of meaningful choice, actually tends to prove the contrary proposition: that he knew what he was doing and did it voluntarily.

Williams had the burden of proving that he had no meaningful choice about whether or not to enter into the contract. Not only did he fail to sustain that burden, but the evidence all points the other way.

## II. *TRUTH IN LENDING ACT*

Williams also seeks rescission, as well as other statutory remedies, under the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1635, 1640. His principal submission is that the $1,273 premium for a life insurance policy was not included as a finance charge in the calculation and disclosure of the annual percentage rate (APR) on his loan. TILA and regulations issued thereunder, 12 C.F.R. § 226.4 (Regulation Z), require premiums for credit life insurance to be included in the finance charge unless there is strict compliance with three enumerated requirements.[2] The agency comments to Regulation Z (assumed for purposes of this motion to have the force and effect of law) further provides that fees for *any* insurance (other than property insurance) must be included in the disclosed finance charge, if the insurance is "required." Official Staff Interpretation to 12 C.F.R. § 226.4(b)(7) & (8), comment 4.

---

1. Plaintiff did not testify as to when precisely the tax sale was scheduled to occur. Plaintiff's expert, however, testified that tax sales take place no sooner than six months after notice of the proposed sale. Tr. 232, 262.

2. Lenders need not included the life insurance premium in the finance charge disclosed to a consumer if: (i) the insurance coverage is not required by the creditor, and this fact is disclosed in writing; (ii) the premium for the initial term of insurance coverage is disclosed, as well as the term of the insurance (if the term *is less* than the term of the loan); and (iii) the consumer signs or initials an affirmative written request for the insurance after receiving the disclosures specified above. 12 C.F.R. § 226.4(d).

I dismissed plaintiff's TILA claim at trial after finding that the $1,273 disbursement to Coxworth & Associates at settlement was not for credit life insurance because the lender was not designated as the beneficiary. Tr. 386–87. Later in the trial, while reconsidering plaintiff's second TILA argument, I found that there was no evidence to refute or offset Williams' clear admissions that insurance was not required and that he purchased the policy voluntarily. Tr. 639–41. The issue was preserved for post-trial briefing. Tr. 823. A third point, argued only in Williams' post-trial brief but considered on its merits nonetheless (see note 6, *infra*), is that First Government failed to deliver in a timely manner the requisite two copies of a notice of his right to rescind the loan.[3]

### a. Beneficiary of the policy

■■ The insurance certificate mailed to plaintiff in March 1995 (the loan closing was on January 13, 1995) does not contain the name of a beneficiary. Instead, it states that the beneficiary is "[a]s specified on application or subsequent endorsement." Pl. Tr. Ex. 4. No beneficiary is named on the application, and no subsequent document exists that resembles an endorsement. Williams insists, however, that a disclosure statement he received at settlement *operates* as a "subsequent endorsement" because it was signed by Williams after the effective date of the policy (even if Williams had not received the policy) and because it contains the statement that the insurance company "will pay all insurance benefits to the Bank which will apply it to the unpaid balance of your loan. The excess, if any, will be paid to your designated Beneficiary." Pl. Tr. Ex. 9.

The printed language indicating that loan proceeds would be paid to "the Bank" does not establish that First Government was a beneficiary: First Government was not a "Bank." Williams' counsel might have, but did not, elicit direct testimony from Williams as to whether he thought he was naming First Government as his beneficiary when he affixed his signature to the disclosure form. In any case, the purpose of the disclosure form was clearly not to name a beneficiary, but to make a record of the voluntary nature of Williams' purchase. Merely arguing that such a disclosure form is an endorsement does not make it one. Had Williams died during the two-year term of the policy, his estate—not First Government or its assignees—would have been entitled to the proceeds of the life insurance policy.[4]

Plaintiff has not established by a preponderance of the evidence that Williams' creditor was the beneficiary of the life insurance policy.

### b. Voluntariness of the purchase

■■ Williams' signature is on an insurance application form and an "optional life insurance disclosure statement," which states in bold letters that the "insurance is not required to obtain credit.... " Pl. Tr. Ex. 8 & 9. Williams also gave clear testimony that he purchased the insurance voluntarily, that he understood the term of the policy was two years when he received it, and that he knew he had 20 days to return the policy after receiving it if he was not satisfied. Tr. 57, 114–16. Williams' purchase of this policy may have been unwise, but no reasonable juror could have concluded that it was involuntary.[5]

---

3. A fourth argument advanced by Williams, and disposed of at trial, is that the insurance policy was worthless because it included a requirement that the insured be "actively working" although plaintiff was retired. This argument does not merit extended discussion. It is supported only by the construction plaintiff's counsel place upon the language of the insurance certificate. None of the cases cited by plaintiff compel a conclusion that the insurance policy was unenforceable.

4. The policy itself provides, as does D.C. statute law, that its proceeds pass to plaintiff's estate or heirs in the absence of a living named beneficiary. Pl. Tr. Ex. 4; D.C.Code § 20–303.

5. Plaintiff now argues that the issue of voluntariness should have been sent to the jury as a special verdict question. Pl. Mot. for Judg. on the TILA Claim at 11, n. 9. Although plaintiff did raise that point in a footnote in his supplemental trial memorandum, he did not pursue the point, either with a proposed verdict form or a proposed jury instruction, nor did he make an oral request for such a special interrogatory.

### c. Notice of right to rescinds [6]

] TILA establishes a right of rescission for any loan transaction in which the borrower's principal dwelling is used as security. 15 U.S.C. § 1635(a). The rescission period extends until "midnight of the third business day following consummation [of the loan], delivery of the notice [of right to rescind], or delivery of all material disclosures, whichever occurs last." 12 C.F.R. § 226.23(a)(3). Under TILA regulations, a creditor is required to "deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind." 12 C.F.R. § 226.23(b)(1). Failure to deliver the notices in a timely manner or in the proper form extends the rescission period from three days to three years. 12 C.F.R. § 226.23(a)(3).

Williams testified that he was not given copies of the closing documents at the settlement on January 13, 1995, but instead that they were mailed to him. Tr. 142. From that assertion of fact, Williams now asks for an inference that mailed copies did not reach him by January 15, 1995—the date by which Williams would have had to receive the documents in order for the rescission expiration date identified on the notice (January 18, 1995) to be accurate. From that inference he advances the legal conclusion that First Government failed to comply with TILA regulations and that he is accordingly entitled to rescind the First Government loan. 12 C.F.R. § 226.23(a)(3).

Williams admits that he signed two copies of the notice of right to cancel at the settlement on January 13, 1995. Def. Tr. Ex. 52, 53. The notices state just above the signature line that plaintiff "acknowledge[s] receipt of two copies of NOTICE OF RIGHT TO CANCEL." Williams' signature on those notices gives rise to a rebuttable presumption that the notices were in fact delivered to him. 15 U.S.C. § 1635(c); *Stone v. Mehlberg*, 728 F.Supp. 1341, 1354 (W.D.Mich. 1989). The question now under consideration is whether Williams adduced evidence of non-delivery sufficient to rebut that presumption. If he did, the question should have been put to the jury, and Williams would be entitled to a new trial.[7]

Plaintiff's direct testimony on this point was given almost in passing (Tr. 61):

> "[A]fter I got through signing the papers, me and Ms. Angel, [the settlement agent] said, that's all for now, we'll get in touch with you."

> "I asked [the settlement agent] was there any papers. He said, no, not at this moment. Ms. Angel—then we left."

Then on cross-examination, this colloquy occurred (Tr. 142):

Q: "When you left First Government on January 13, 1995, you, in fact, had a set of documents, copies of the documents that they gave you to take home, didn't you?"

A: "To the best of my recollection, no, sir. On the 13th?"

Q: "They didn't give you any documents?"

A: "Not to my recollection, no, sir. I got them in the mail."

A portion of Williams' deposition was then read into the record to the effect that Williams had "look[ed] at those papers when [he] got home," and that that happened "the day of the settlement." Tr. 143. Plaintiff, after being confronted with his previous questions and answers, said that he had also

---

**6.** Plaintiff was given leave to file a supplemental trial memorandum in support of his TILA claim following an off-the-record chambers conference conducted on May 14, 1997. The supplemental trial memorandum makes no mention of the question of the alleged non-delivery of copies of the settlement documents, nor was the issue raised in any of the briefs and memoranda submitted before trial. If there was discussion of the non-delivery issue in the chambers conference, it certainly was not the focus of that conference. Nevertheless, plaintiff was given leave to file yet another memorandum post-trial to pro-

tect his record, Tr. 627, and the issue will accordingly be treated as if it had been properly raised and preserved at trial.

**7.** Although plaintiff fashions his post-trial motion as one for judgment pursuant to Rule 58, the motion will be treated as one for a new trial. Plaintiff requested that the verdict form include a special interrogatory as to whether Mr. Williams left the settlement with the required settlement documents. I denied that request. Tr. 661–62.

received papers before the date of closing. Tr. 144.[8]

Williams did not rebut the presumption created by his signatures on the two notices of right to cancel: neither his own testimony nor any other evidence established that the settlement documents were not delivered to him by January 15, 1997, three days before the rescission expiration date identified on the notice of right to cancel.[9] Williams' testimony that he did not receive copies at the settlement, and that he received them in the mail (without saying *when* he received them) did not exclude the possibility that he received them on January 14 or 15, 1995.[10] I am mindful of decisions from other courts requiring that lenders observe the most punctilious compliance with the disclosure requirements of TILA.[11] But, especially where the stakes are so high for lenders who fail to meet the strict standards of TILA, it is reasonable also to require strict proof of a claim of non-delivery. Williams' testimony, on its own, is not sufficient.

\* \* \*

Plaintiff did not sustain his burden of proof on his Truth In Lending Act claims, and his post-trial motion for judgment will be denied.

## III. JUDGMENT NOTWITHSTANDING THE VERDICT

Having carefully reviewed the arguments advanced by the defendant in support of its motion for judgment notwithstanding the verdict, I find that the record contains sufficient evidentiary support to sustain the jury's verdict under the District of Columbia's Consumer Protection Procedures Act.

---

8. The status of these deposition excerpts—whether extrinsic evidence of a prior inconsistent statement (F.R.Evid.613(b)) or admissions (F.R.Evid. 801(d)(2))—was not clarified on the record. The only objection to their being read, "time frame," was overruled. Tr. 143.

9. Nothing in the statute or regulations requires delivery be made at settlement. In order to comply with TILA, the lender must deliver the notice at least three days prior to the rescission expiration date on the notice. 12 C.F.R. § 226.23(a)(3).

10. Williams failed to call the only other witness to the actual closing, a friend who accompanied him and who might have provided corroboration that the documents were not handed to him. Even such corroborating testimony, however, would not have established that he did not receive the documents on or before January 15, 1995.

11. See, e.g., Taylor v. Domestic Remodeling, Inc., et al., 97 F.3d 96, 99 (5th Cir.1996) (incorrect rescission date combined with disbursement of loan constitutes violation of TILA); Williamson v. Lafferty, 698 F.2d 767, 768–69 (5th Cir.1983) (failure to fill in rescission expiration date violates TILA). See generally Semar v. Platte Valley Fed. Sav. & Loan Ass'n, 791 F.2d 699, 704 (9th Cir.1986) (holding that technical violations of TILA impose liability on creditors); Mars v. Spartanburg Chrysler Plymouth Inc., 713 F.2d 65, 67 (4th Cir.1983) (same).